1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  JOSHUA MICHAEL MEJIA,                    1:09-cv-01885-SMS (HC)

10                    Petitioner,           ORDER DENYING PETITION FOR WRIT OF
                                            HABEAS CORPUS, DIRECTING CLERK OF
11       v.                                 COURT TO ENTER JUDGMENT IN FAVOR
                                            OF RESPONDENT, AND DECLINING TO
12                                          ISSUE A CERTIFICATE OF APPEALABILITY
     HARRINGTON,
13
                      Respondent.           [Doc. 11]
14  _____/

15
16       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17  pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to

18  the jurisdiction of the United States Magistrate Judge.  Local Rule 305(b).

                          RELEVANT HISTORY[1]
19
20       Following a jury trial in the Tuolumne County Superior Court, Petitioner was found

21  guilty of first degree murder.  He is currently serving a sentence of 25 years-to-life.

22       On January 9, 2006, Petitioner filed a notice of appeal in the California Court of Appeal,

23  Fifth Appellate District.  On March 15, 2007, the state appellate court affirmed the judgment.

24       Petitioner then sought review in the California Supreme Court, which was denied on June

25  13, 2007.

26       Petitioner submitted a petition for writ of habeas corpus to the Tuolumne County

27  Superior Court on December 17, 2007.  The petition was denied on January 17, 2008.

28
     _____
         [1] This information is derived from the state court documents lodged by Respondent on July 21, 2010.

                                            1

1   Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal,

2   Fifth Appellate District, dated July 13, 2008.  The petition was denied on December 30, 2008.

3   Petitioner filed a habeas corpus petition in the California Supreme Court, dated February

4   2, 2009.  The petition was denied on July 22, 2009.

5   Petitioner submitted the instant federal petition for writ of habeas corpus on October 21,

6   2009, which was filed on October 27, 2009, containing eighteen claims for relief.  At the same

7   time, Petitioner filed a motion for stay and abeyance of the federal petition pending exhaustion of

8   the state court remedies with respect to claims 15, 16, and 17.

9   Petitioner filed a subsequent habeas corpus petition in the California Supreme Court on

10  September 24, 2009, which was denied on March 10, 2010.

11  On April 8, 2010, Petitioner filed an amended petition for writ of habeas corpus, which

12  contains all eighteen exhausted claims.

13  STATEMENT OF FACTS[2]

14  Robert Johannes, age 48, lived by himself in a house owned by his mother in the
    Crystal Falls area of Tuolumne County, east of Sonora. Johannes had been injured
15  in a work-related accident in 2001, and he eventually received, in late 2003 or
    early 2004, a lump sum workers' compensation payment of about $5,000,
16  followed by biweekly benefit checks for $382. Johannes's condition deteriorated
    further when he suffered a stroke in the fall of 2002. The stroke left him with
17  limited mobility, and required him to use a cane to get around.

18  Johannes's house was located on a wooded, steeply sloped lot uphill from a county
    road. There were some 70 steps leading from a parking area along the driveway to
19  the house itself, which one entered through a sliding glass door off the porch. The
    living area was on the right, and the kitchen and dining areas on the left. Across
20  the room from the door, a staircase led to Johannes's bedroom in a second-story
    loft area. Given his limited mobility, Johannes spent a lot of time in his bedroom.
21  And he relied on his family and friends to take him places, and help with
    shopping, the housework, and his other needs.

22
    Johannes's other needs included methamphetamine. He sometimes gave people
23  money to go buy it for him, including the defendant, Joshua Mejia, and Mejia's
    girlfriend Rachel Demore. Johannes had been seen taking the money he paid for
24  the drugs from an envelope of cash he kept in his bedroom.

25  Mejia and Demore had grown up in the area. After becoming a couple, they lived
    for a while with her parents, then with his parents (whose house was only two or
26  three away from Johannes's), and finally, beginning in December of 2004, by

27  ────────────────

28      [2] This information is taken from the California Court of Appeal, Fifth Appellate District's March 15, 2007
    decision.

themselves in a converted garage apartment they rented for $400 per month (which was paid initially by Mejia's parents). Neither Mejia nor Demore worked regularly, however, and they both smoked methamphetamine whenever they could, so they seldom had much money. As a result, they were unable to pay their rent, and had to move out of their apartment at the end of February of 2005.

During the several preceding months, Mejia had often talked to his friends about a "comeup," meaning "pretty much getting anything that you can that's worth something that you can get ... money [f]or." More particularly, Demore would later testify, Mejia said "he knew this guy that has a lot of money and it would be a good comeup and he wanted to, you know, go up there and beat him up and rob him." FN1 Mejia was referring to Robert Johannes.

FN1. In fact, Johannes had already spent most, if not all, of his $5,000 lump-sum workers' compensation payment. Johannes's sister testified he had given her $3,000 in 2004 to take his two daughters on a trip to Disneyland, and another $2,000 to buy them clothes and Christmas gifts.

The only person, according to Demore, who showed any real interest in Mejia's idea, was his friend, Josh Perry (sometimes identified as Josh Menking).

On March 1, 2005, Mejia and Demore packed up the stuff at their apartment, and spent the night there. The next afternoon, March 2, they drove in Mejia's pickup truck to a friend's house who "fronted" them some meth. They smoked some of it, and took the rest with them to Johannes's house later the same day. Mejia was wearing a sweatshirt, jeans, and a new pair of boots he had bought two weeks earlier with birthday money his parents gave him.

Mejia and Demore went up to Johannes's bedroom and smoked more of the meth with him. After awhile, Demore began cleaning Johannes's house as a way of repaying him the money he had given her and Mejia a few days before to buy drugs. She picked up the trash, vacuumed upstairs and down, did some dusting, washed the dishes, and wiped down the counters. Mejia remained upstairs with Johannes.

At some point, Mejia came down and got Johannes a glass of Kool-Aid. He later told Demore he had put something in it-evidently Formula 409 household cleaner-that he had hoped would make Johannes fall sleep. But the Kool-Aid tasted bad and Johannes did not drink it.

Later that afternoon, while Mejia and Demore were still at Johannes's house, some people came by and paid him $150 for a car he had sold them.

Once she finished cleaning, Demore talked some more with Mejia and Johannes in the bedroom, then left the house to wait for Mejia in the pickup. At that point, Demore testified, Johannes's metal cane was downstairs, hanging on the back of one of the dining room chairs.

Demore had been waiting in the pickup for five or ten minutes when the outside lights around Johannes's house went out. She walked back up to the house to investigate and found Mejia downstairs in the darkened living room. He motioned for her to be quiet and to go back to the pickup, which she did. Demore described what happened next.

"It was quiet for a minute and then I heard what sounded like a wrestling match going on. I didn't hear anybody yelling, I didn't hear anything, I just heard like banging, like somebody was wrestling, and that went on for a couple minutes and then it went quiet and a couple minutes later, Josh [Mejia] ran down the driveway and he had a pillowcase over his shoulder and it had a bunch of stuff in it. [¶] ... [¶] "He was pretty shook up. He told me when he was up there, Bob [Johannes] had come down the stairs and he said he [Johannes] was holding the cane up like he was going to hit him [Mejia] and Josh said he took a swing at him [Johannes] and they started wrestling, and somehow they ended up in the bathroom and he told me that he had hit him several times over the head with the cane and that he stomped on his chest and then he beat him up with his fists and he said he wouldn't knock out when he was hitting him. He [Johannes] was saying, 'I didn't mean to touch her, I didn't mean to touch her.' [¶] ... [¶]

"He said after he hit him over the head with the cane and stuff, he had gone upstairs and he grabbed everything that he could and he said when he flipped up the mattress, he found like child pornography and like a bunch of sex toys and he threw them all over the place before he left."

Demore observed that Mejia's hand was "swollen up huge."

Demore did not see Josh Perry at Johannes's house at any time that evening, nor did Mejia ever tell her Perry was, or had been, at the house.

Mejia and Demore drove to a friend's house, where Mejia dumped out the contents of the pillowcase onto a bed. There were some video game cartridges, a pistol in a blue canvas carrying case (the same pistol Mejia had stolen once before and sold to Johannes), a BB rifle, some glass meth pipes, an old stamp with a picture of Hitler on it, and several pieces of women's jewelry in a wooden box. All these items would later be identified as having belonged to Johannes; the jewelry had been his aunt's, and had been given to him to pass on to his two daughters. Mejia gave some of the items to the people at the house.

Mejia and Demore then drove back to their apartment. Demore resumes the story. "... [W]hen we got there, Josh told me to take off my clothes, change my clothes and take off my shoes, and he took off his sweatshirt and his pants and he sorted through everything that he wanted in the bag [pillowcase] and left it out and everything that he didn't want, he put in the bag with our clothes and he threw it on the fire [in an outdoor burn pile]."

Mejia did not, however, throw his new boots into the fire. "[W]e went and got some beer after that, after he [Mejia] had burned the stuff, and we came back and packed up a little bit and we went to sleep."

When Mejia and Demore awoke the following afternoon, March 3, Mejia started calling around trying to sell the things he had taken from Johannes's house. Someone named John agreed to buy the video games. Mejia and Demore drove to John's house. He gave them a hundred dollars for the games. "[W]e stayed there for a minute and did a line and left."

They drove next to Josh Perry's house, because Mejia said Perry owed them some money or drugs. It was dark by the time they arrived. Demore overheard Mejia ask Perry "where were you and stuff...." And Mejia told Perry something to the effect that he had beaten up a child molester. Mejia gave Perry some of the jewelry, and the Hitler stamp.

Mejia and Demore stayed only about 20 minutes at Perry's house before returning to their apartment. They packed up more of their stuff, gave the owner some money, and then drove to yet another friend's house, where they spent the rest of the night sleeping in their pickup in the driveway. It was now early in the morning of March 4. The following day, Mejia and Demore borrowed some money from Mejia's aunt and headed for Salinas where Mejia's brother was living. Mejia and his brother sold the handgun for $100 and a "pretty good amount of cocaine." Two days later, on March 7, Mejia and Demore drove to the nearby town of Prunedale, where they stayed with some friends of Mejia's parents (who also were there). It was in Prunedale, on March 9, that Mejia and Demore learned warrants had been issued for their arrest for Johannes's murder. Mejia's parents hired a lawyer, who arranged for the couple to turn themselves in to police. Before that happened, however, Mejia took off his boots and threw them into some bushes near the Prunedale house. He was wearing tennis shoes when he was arrested

Johannes's body had been discovered on the afternoon of March 3, downstairs on the floor of a bathroom adjoining the kitchen. Based on an analysis of blood stains and spatters found in the house, Johannes initially was attacked near the bottom of the stairs, then dragged across the carpet to a point in the living room, and then dragged again from there through the dining area and across the linoleum floor in the kitchen to the bathroom, where he was beaten some more. There were two bloody footprints on the kitchen floor. Johannes's metal cane was on the sofa; it appeared to be bent, and had dried human blood on it. The cane's rubber tip had detached and was found on the living room floor.

Johannes had $147.15 in the pocket of his pants. The T-shirt he was wearing had what later appeared to one investigator to be a shoe print in the blood on the front of the shirt, with a herringbone pattern different from that in the bloody footprints on the floor. But a criminalist who also examined the shirt was unable to confirm the investigator's suspicion.

The pathologist who performed an autopsy of Johannes's body found numerous blunt force injuries and lacerations on his face and head inflicted by "something like a pipe or something heavy and hard with a relative[ly] linear shape to it," like Johannes's metal cane. The pathologist acknowledged the injuries also could have been inflicted with a pool cue. One potentially fatal blow had fractured the base of Johannes's skull and caused bleeding over the surface of his brain. There also were bruises and contusions on his face consistent with his having been punched or kicked.

Another potentially fatal blow to Johannes's neck had fractured the hyoid bone protecting his breathing passage. Such an injury could have caused a "severe spasm of the airway" leading eventually to suffocation.

And Johannes had "very significant" chest injuries caused by having been kneed or "stomped" with great force. "The breast bone was fractured in two and all the ribs around the edges were broken inward and there was a depression there." This resulted in "what we call a flail chest on both sides and that is a loss of continuity of the rib cage [such that] the person can no longer exchange air properly [and] they may suffocate." Similar knee or stomping blows to Johannes's abdomen had lacerated his liver and spleen, and caused internal bleeding. Johannes's death was probably caused by the combined effect of these injuries.

A toxicology test established that Johannes, at the time of his death, had "a large quantity" of methamphetamine in his system.

A palm print from Mejia's right hand was found on top of the kitchen stove, in an area adjacent to the route from the bathroom into the kitchen, and facing outward from the bathroom. The print was consistent with one that would have been left "if a person were to step out of the bathroom over the victim [Johannes] and put their hand on the stove for support." A thorough cleaning of the stovetop (such as Demore said she had done) would have removed any pre-existing prints, in which case the palm print would have to have been left afterward.

Seven latent prints were found on Johannes's cane. Three matched Mejia's left palm, and one matched his right little finger. The remaining three were insufficiently clear to establish a definite match, but could have been left by Mejia. The location and orientation of the prints indicated that Mejia had held the cane by the end away from the curved handle.

All the prints found at the scene were compared with those for Johannes, Demore, and Josh Perry, in addition to Mejia. Two prints taken from the sliding glass door were matched to Johannes, and one print on the bathroom sink was matched to Demore. None of the prints belonged to Josh Perry.

The soles of Mejia's boots (the ones he had tossed into some bushes in Prunedale) were compared with the two bloody footprints found near Johannes's body on the kitchen floor of his house. Despite some similarities, there was too little detail in the footprints to match them positively to the boots.

Investigators searching Johannes's bedroom found a sexually explicit magazine called "Naughty Neighbors" under his bed, but they found nothing there or elsewhere in the house containing photographs of children in sexual poses. Nor was any such material found among Mejia's possessions when officers searched the contents of his pickup truck.

In addition to telling police where to look for Mejia's boots, Demore provided other information that led investigators to some of the items Mejia reportedly had taken from Johannes's house on the night of the murder. Some pieces of the jewelry (but no clothes) were found in the burn pile at Mejia's and Demore's former apartment. The BB gun, rifle, some video games, and additional jewelry items were recovered from the persons to whom, by Demore's account, Mejia had given them. This included Josh Perry, who later led investigators to the mud hole where he had disposed of the jewelry.

Mejia's Defense

Mejia testified in aid of his own defense, which was, essentially, that Josh Perry killed Robert Johannes after he (Mejia) had left Johannes's house.
Mejia acknowledged having talked to some people, including Perry, about a "comeup," i.e., a theft, at Johannes's house, but dismissed the talk as idle conversation and denied going to the house on March 2, 2005 for that purpose. He went instead, he said, to make up for having accepted $100 from Johannes a few days earlier to go buy him some meth, and then using all the drugs for himself and Demore.

By Mejia's account, he and Demore smoked the meth they had brought with them with Johannes. They talked and played video games in his bedroom. Time passed.

The people who were buying Johannes's car came and left. Demore was downstairs cleaning; Mejia and Johannes were upstairs in the bedroom. Then Johannes went to the restroom.

While Johannes was in the restroom, Mejia decided to help Demore with the cleaning, and started to collect the trash in the bedroom. As he did, he found a sexually explicit magazine called "Naughty Neighbors." He sat down on the bed to look through it, when two Polaroid photographs fell out. They appeared to Mejia to show Johannes's two young daughters engaged in "some sort of sexual act." Mejia was "really disgusted" and put the photographs back inside the magazine. Then, for reasons he could not later explain, Mejia gathered up the video games and a BB gun and put them in a pillowcase. (He denied taking Johannes's black pistol or the wooden box of jewelry.) Mejia took the pillowcase downstairs and put it outside on the porch with the trash, near the sliding glass door. Then he went back upstairs.

At this point, Johannes came out of the bathroom. Mejia accused him of being a child molester. Johannes got angry and started yelling at Mejia to leave. The commotion brought Demore upstairs. Johannes made a lewd comment to Demore, and she hit him in the face three times with her fist. Johannes lifted his cane as if to hit Demore, whereupon Mejia stepped in between them and told Demore to go downstairs. She left the house and walked down toward the pickup. Mejia took the cane away from Johannes and threw it on the bed. He then went downstairs and out of the house through the sliding glass door.

At that moment, Mejia testified, "Josh Perry jumped out from behind the house over the railing" and onto the porch. He was dressed entirely in black, and was wearing blue rubber gloves. He asked Mejia "if we were going to do a comeup." Mejia said no, but added that "Bob [Johannes] was more than likely a child molester." Perry reportedly responded "he needed money and he wanted to do a comeup and basically he didn't care what was going on." Mejia reportedly told Perry "that I was leaving and I didn't want nothing to do with it." Mejia denied having previously made plans with Perry to do a comeup that day at Johannes's house.

Despite Mejia's attempts to stop him, Perry ran into the house and up the stairs to the bedroom. Mejia followed as far as the living room. "I heard a few noises going on upstairs and I was at the bottom of the stairs and I had seen Bob come to the door and he had his cane in his hand and Perry was hitting him." Perry knocked Johannes to the ground and "stomped" him repeatedly in the head and chest before sending him "Tilt-A-Whirling" down the stairs, stilling holding onto his cane. Perry then started "beating the hell out of [Johannes]" with the cane, and stomping on him intermittently while looking around the house for things to steal. Mejia was too frustrated and scared at this point to know what to do. Finally, however, he retrieved the pillowcase containing the BB gun and video games, and left the house. Demore was waiting for him down below. They got into the pickup and drove to their former apartment. According to Mejia, he told Demore along the way about everything that had happened up at the house with Perry.

At the apartment, Mejia punched his truck out of frustration, which accounted for his swollen hand. He acknowledged burning some "junk" that night in the burn pile, but described it as "miscellaneous items" that "we didn't want to take with us to Salinas." He recalled, however, seeing Demore throw a bag of clothes into the fire, along with "a small wooden box." Mejia denied trying to poison Johannes's Kool-Aid, and denied throwing his boots into the bushes in Prunedale.

After his arrest, Mejia gave an interview to investigators in which, over the course of several hours, he offered various conflicting versions of the circumstances surrounding Johannes's death. His testimony at trial was different still, in many particulars, from what he had told the investigators. He had not been entirely truthful, Mejia explained, because he was trying to protect Demore, and avoid implicating his friends. Eventually, however, as we have explained, he directly implicated Demore in the theft of Johannes's property (his jewelry in particular), and named Perry as Johannes's killer.[FN2]

FN2. One of the witnesses who testified for the defense was a friend of Mejia's named Carl Greenway. Greenway and Mejia had been housed at the same time at the county jail, sometime after Mejia's arrest in this case. Greenway testified he had seen Josh Perry at a friend's house on the night of March 2, 2005. He remembered the date because he had seen a story in the local newspaper that day about Johannes's murder. Perry had come to the house to sell Greenway's friend some crystal meth, and Greenway acted as the middleman in the transaction, which took place outside at Perry's car. According to Greenway, Perry seemed scared and agitated. He was also flashing around a large roll of cash that appeared to Greenway to contain between four and five thousand dollars. The roll of cash was wrapped in a check stub and secured with a rubber band. The check stub had " 'United States Treasury' " written on it, along with the name "Robert Johannes" or "Robert Johnson."

In rebuttal, the prosecution presented evidence that Johannes's murder was not reported in the newspaper until March 4, 2005; that Johannes's benefit checks came from the state rather than from the federal government; and that his name did not appear on the check stubs.

Officers arrested Perry on March 17, 2005. A search of the vehicle he was driving, which belonged to his girlfriend, produced the bottom half of a screw-together pool cue, a rifle belonging to a friend's father, and a pair of tennis shoes having a herringbone pattern on the sole.

Rebuttal Testimony

Demore, in rebuttal, reaffirmed her earlier testimony and denied Mejia's account of events insofar as it differed from her's.

The prosecution also called Josh Perry as a rebuttal witness. Perry testified he did not know Robert Johannes; he had never been to Johannes's house and was not there on March 2, 2005; he did not steal anything from Johannes; and he did not hit, kick, or beat Johannes with anything, nor did he kill him.

(Lod. Doc. 4 at 2-11.)

DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Tuolumne County Superior Court, which is located within the jurisdiction of this

Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d)

unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly

established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct.

770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412

(2000).  Habeas relief is also available if the state court's decision "involved an unreasonable

application" of clearly established federal law, or "was based on an unreasonable determination

of the facts" in light of the record before the state court.  Richter, 131 S.Ct. 785 (citing 28 U.S.C.

§ 2254(d)(1), (d)(2)).  "[C]learly established ... as determined by" the Supreme Court "refers to

the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412.  Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent.  Rather, the Supreme Court case itself must have "squarely" established that specific legal rule.  Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009).  Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls.  Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011).   "A state court's determination that a claim lacks merits precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Richter, 131 S.Ct. at 784.

III.   Review of Petition

For ease of reference and analysis, the Court has lumped all related claims under a single heading with corresponding sub-headings.

A.   Suppression of Favorable Evidence

Petitioner raises six separate but related claims that the prosecution suppressed potentially exculpatory evidence-Claims Two, Four, Six, Seven, Ten and Eleven.  Each claim will be addressed in turn.

1          1.      Claim Two

2          Petitioner claims the prosecutor suppressed evidence that witness Rachel Demore had an

3  "alleged agreement with the D.A. to testify," that she rehearsed the testimony with the district

4  attorney and investigator, and that the district attorney refused to comply with his discovery

5  request.

6          Petitioner presented this claim in his first state petition for writ of habeas corpus in the

7  California Supreme Court.  The court denied the claim without comment.

8          a.      Procedural Bar

9          In rejecting the claim, the appellate court cited In re Dixon, which stands for the

10  proposition that federal review is barred where the claimed errors could have been, but were not

11  raised in a habeas petition on direct appeal from conviction, unless the claims fall within an

12  exception to the rule.  Dixon, 264 P.2d at 515.

13          A federal court will not review a petitioner's claims if the state court has denied relief of

14  those claims pursuant to a state law that is independent of federal law and adequate to support the

15  judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct. 2590, 2592 (1991); Coleman v.

16  Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 2553-54 (1989).[3]  To be adequate, the state

17  rule must be well-established and consistently applied in the vast majority of cases.  Poland v.

18  Stewart, 169 F.3d 573, 578 (9th Cir. 1999); Wood v. Hall, 130 F.3d 373, 378 (9th Cir. 1997).  To

19  be independent, the state rule must not be interwoven with federal law, such as when its

20  application depends upon a finding of no federal constitutional error.  Coleman, 501 U.S. at 735;

21  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000).  But even when the state procedural rule

22  is both independent and adequate, federal courts may nevertheless review the merits if the

23

24          [3] The United States Supreme Court has granted certiorari in Walker v. Martin, __ U.S. __, 2010 WL
25  621406 (2010) on the following questions:

26          Under state law in California, a prisoner may be barred from collaterally attacking his conviction
    when the prisoner "substantially delayed" filing his habeas petition.  In federal habeas corpus
27  proceedings, is such a state law "inadequate" to support a procedural bar because (1) the federal
    court believes that the rule is vague and (2) the state failed to prove that its courts "consistently"
28  exercised their discretion when applying the rule in other cases?

1    petitioner can show cause and prejudice or, alternatively, a fundamental miscarriage of justice.

2    Coleman, 501 U.S. at 750; Beauty v. Stewart, 303 F.3d 975, 987 (9th Cir. 2002).

3            In this instance, the Court of Appeal found this claim was procedurally barred because it

4    was not presented in the direct appeal.[4]   The state court applies the Dixon bar consistently, and it

5    is independent of federal law.  See Bennett v. Mueller, 322 F.3d 573, 581-583 (9th Cir. 2003)

6    (finding Dixon to be independent and placing initial burden upon prisoner to challenge

7    adequacy).  Because Petitioner has not met his burden of demonstrating inadequacy or

8    consistency of the procedural bar, the claim is barred in this proceeding.

9                            b.    Merits

10           Notwithstanding the procedural bar, the claim fails on the merits.  Petitioner contends the

11   prosecutor "suppressed" material impeachment evidence concerning the fact that witness Demore

12   made a plea agreement with the prosecution in exchange for her testimony, and Petitioner claims

13   she had reason to lie when she testified.

14           After finding the claim procedurally barred, the California Supreme Court denied the

15   claim on the merits without comment.  The "silent" denial is considered a merits adjudication.

16   Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002), amended 311 F.3d 928 (9th Cir. 2002).  In

17   this circumstance, the Court conducts an independent review to determine if the state court

18   properly applied the controlling federal law.  Id.

19           The prosecution's suppression of evidence favorable to an accused violates due process

20   where the evidence is material either to guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 87

21   (1963).  To constitute a Brady violation, the Supreme Court has set forth a three-part test: 1)

22   "The evidence at issue must be favorable to the accused, either because it is exculpatory, or

23   because it is impeaching"; 2) "[T]hat evidence must have been suppressed by the State, either

24   willfully or inadvertently"; and 3) "[P]rejudice must have ensued."  Strickler v. Greene, 527 U.S.

25   263, 281-282.  Evidence is material "only if there is a reasonable probability that, had the

26   _____

27         [4] In the alternative, the court denied the claim on the merits.  However, this does not defeat the application
     of the procedural bar in this Court.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); see also Taylor v. Norris,
28   401 F.3d 883, 885-886 (8th Cir. 2005); Johnson v. Pinchak, 392 F.3d 551, 557-558 (3d Cir. 2004); Carriger v.
     Lewis, 971 F.2d 329, 333 (9th Cir. 1992).

1   evidence been disclosed to the defense, the result of the proceeding would have been different."

2   United States v. Bagley, 473 U.S. 667, 682 (1985).  "[A] constitutional error occurs, and the

3   conviction must be reversed, only if the evidence is material in the sense that its suppression

4   undermines confidence in the outcome of the trial."  Id. at 678.

5        In this instance, the record demonstrates the prosecution disclosed that Demore originally

6   had been charged in the murder of Johannes, and that those charges and other charges were

7   dismissed in exchange for her truthful testimony.  The jury was well aware of the agreement and

8   could consider any effect the agreement may have had on Demore's credibility.  See e.g. Gallego

9   v. McDaniel, 124 F.3d 1065, 1078 (9th Cir. 1997) (where jury is informed of existence of plea

10   agreement, the fact the plea bargain was contingent upon agreement to testify against defendant

11   did not rise to level of due process violation because the witness was required to testify fully and

12   truthfully, and defendant was able to impeach credibility on the basis the plea bargain may have

13   influenced witness to life).  Petitioner has failed to support his claim with any evidence to the

14   contrary, and there is no showing that the state courts' determination of this issue was contrary

15   to, or an unreasonable application of, clearly established Supreme Court precedent.

16               2.    Claim Four

17        Petitioner also claims the prosecution failed to disclose the plea agreement made with

18   witness Perry.

19             a.    Procedural Bar

20        Both the Tuolumne County Superior Court and the Court of Appeal found the claim was

21   barred.  The Tuolumne County Superior Court found the petition was not properly filed because

22   it was not on the proper form, nor was the petition verified.[5]  The Court of Appeal rejected the

23   claim, citing the Dixon procedural bar, because it was not presented on direct appeal.  The

24   California Supreme Court summarily denied the claim.

25   ///

26   ///

27

28

---

[5] The Superior Court also found the claim was procedurally barred because it was not presented on appeal.

b.     Merits

As previously stated, the controlling federal law is set forth in Brady v. Maryland, 373 U.S. 83, and Petitioner must demonstrate an unreasonable application of Brady. Perry testified as a rebuttal witness, in response to Petitioner's own testimony at trial that Perry, and not he, killed Johannes. (RT 1261-1262, 1324-1327.) At the beginning of Perry's testimony, he was specifically questioned regarding the agreement he made with the district attorney's office. The jury was well aware of the plea agreement in both the Johannes case as well as another pending criminal matter. The plea agreement included Perry's guilty plea to conspiracy to commit robbery and to receiving stolen properly in the Johannes case, in exchange for Perry's truthful testimony. Given the full disclosure of the agreement with Perry and Petitioner's ability to cross-examine him regarding the agreement, there is simply no showing that the prosecution violated Brady, and Petitioner's claim to the contrary is rejected.

3.     Claim Six

Petitioner contends the prosecution failed to disclose evidence showing it had meetings with various individuals who purportedly may have had some involvement with or knowledge of Petitioner's case. Petitioner contends some of these individuals were "recruiting witnesses for Perry's alibi."

a.     Non-Cognizable State Law Claim

Respondent initially argues that this claim involves a question of state law only. To the state superior court Petitioner presented this claim in conjunction with a motion for discovery. The superior court rejected the claim because it was a request for discovery over which the court had ability to authorize after the judgment became final. The court cited state law in support of its ruling.

Habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law. Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985). Petitioner's claimed error regarding the state court's application of its own law does not provide grounds for federal habeas relief, because this Court does not re-examine a state court application of its own law.

1  Lambert v. Stewart, 191 F.3d 1181, 1183 (9th Cir. 1999) (en banc), citing Estelle v. McGuire,

2  502 U.S. at 67-68.

3                           b.      Merits

4         Even if this claim presents a cognizable federal question, it fails on the merits.  Petitioner

5  presented this claim in his first habeas corpus petition to the California Supreme Court.  The

6  court rejected the claim.  It appears that Petitioner is objecting to the failure to provide him with

7  unidentified, potentially exculpatory discovery regarding certain named witnesses.  Petitioner has

8  failed to explain how this unidentified discovery qualifies as Brady material, or how the

9  prosecution's failure to provide such alleged discovery violated any constitutional right.

10  Respondent correctly points out that "[p]rosecutors are under no obligation to disclose their

11  theories, thought processes, or even all investigatory work."  Siripongs v. Calderon, 167 F.3d

12  1225, 1227 (9th Cir. 1999).  In addition, habeas corpus review is limited to correcting real and

13  obvious wrongs.  "It was never meant to be a fishing expedition for habeas petitioners to 'explore

14  their case in search of its existence.'"  Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999).

15         There is no showing that the state court's rejection of this claim was unreasonable given

16  that Petitioner made vague requests without any factual support.  Accordingly, Petitioner has not

17  demonstrated that the state court unreasonably applied Brady, because he has not shown the

18  prosecution suppressed exculpatory or impeaching evidence.

19                 4.      Claim Seven

20         Petitioner further claims the district attorney failed to turn over audiotapes of interviews

21  with witness Diane Menking, along with other miscellaneous discovery materials.  Petitioner

22  presented this claim to the California Supreme Court in his first habeas corpus petition.  The

23  court denied the petition without comment.  In such circumstance, this Court independently

24  reviews the claim to determine whether the state courts properly applied controlling federal law.

25

26         It appears Petitioner contends that the district attorney failed to provide audiotapes of

27  interviews that took place prior to the filing of criminal charges.  However, the record reveals

28  that the district attorney provided most of the items requested by defense counsel, and there is no

1   showing that Petitioner failed to receive the requested discovery prior to his trial.

2        Petitioner also claims that the prosecution withheld evidence demonstrating that Perry

3   and Chace Wanamaker confessed to their involvement in the homicide and these witnesses

4   fabricated their testimony.  Petitioner's claim is without merit because these witnesses testified at

5   trial, and several were in fact called by the defense.  Thus, there is no basis to Petitioner's claim

6   that he was deprived of exculpatory or impeaching evidence.  Moreover, Petitioner does not

7   explain how he was unable to impeach or challenge the witnesses' credibility during their

8   testimony at trial.  Nor has Petitioner shown that any material evidence was withheld by the

9   prosecution.  Therefore, Petitioner has failed to demonstrate that the state court's rejection of this

10  claim was an unreasonable application of United States Supreme Court precedent.

11              5.    Claim Ten

12       Petitioner claims he suffered a due process violation because law enforcement hindered

13  him from obtaining exculpatory evidence.  His claim appears to be based on the alleged fact that

14  law enforcement officers conducted an improper investigation which prevented him from

15  obtaining exculpatory evidence.

16       Petitioner exhausted this claim by presenting it to the California Supreme Court in his

17  first habeas petition.  The supreme court denied the claim without comment.  Petitioner claims

18  law enforcement acted in bad faith by failing to obtain or disclose evidence that might have

19  linked Perry to the murder, and points to testimony by a criminalist and Detective Moses

20  regarding boot prints and clothing as potential exculpatory evidence under Brady.

21       Both of the witnesses Petitioner identifies in this claim testified at trial and were subject

22  to cross-examination by Petitioner's counsel.  More specifically, defense counsel cross-examined

23  Detective Moses (RT 1076-1100, 1114), and recalled the detective to testify during the

24  presentation of the defense evidence (RT 1490-1497, 1502-1502).  Therefore, this evidence was

25  not suppressed by the prosecution and Petitioner availed himself of challenging such testimony.

26  Under these circumstances, there is no showing that Petitioner suffered a constitutional violation,

27  and the state court's rejection of this claim was not unreasonable.

28  ///

1 ///

2       6.    <u>Claim Eleven</u>

3    Petitioner claims witness Steven Donahoo, who testified at his trial, was promised by

4 police that they would not search Donahoo's home or prosecute him if he and his brother

5 returned stolen property.  Petitioner presented this claim in his first habeas corpus petition which

6 was summarily denied by the California Supreme Court.

7    As previously stated, in order to demonstrate a violation of <u>Brady</u>, Petitioner must

8 identify favorable evidence that was exculpatory or impeaching; show the evidence was

9 suppressed by the State either willfully or inadvertently; and show resulting prejudice.  <u>Stickler v.</u>

10 <u>Greene</u>, 527 U.S. at 281-282.

11    Donahoo testified at trial and indicated that he had a prior felony conviction for assault

12 with a knife.  He further stated that the prosecutor had not made any promises to him in exchange

13 for his testimony.  (RT 547-548.)  There is simply no support for Petitioner's claim that police

14 threatened Donahoo or made promises to him in exchange for his testimony.  Thus, the state

15 court's rejection of this <u>Brady</u> claim was not unreasonable.

16    B.    <u>Prosecutorial Misconduct-Conviction Obtained by Use of False Evidence</u>

17    As with the prior claims, Petitioner argues the prosecutor committed misconduct.  These

18 claims appear in the Petition as numbers One, Three, Five and Eighteen.  (Pet. at 9-11, 17.)

19       1.    <u>Claim One</u>

20          a.    <u>Procedural Bar</u>

21    In his first claim, Petitioner alleges his conviction was obtained through the use of false

22 evidence.  This claim was presented for the first time to the California Court of Appeal in a

23 habeas petition.  The claim was rejected.  The court applied the <u>Dixon</u> procedural bar because

24 Petitioner failed to present the claim on direct appeal, and he failed to present it to the superior

25 court in his habeas corpus petition.  The state court applies the Dixon bar consistently, and it is

26 independent of federal law.  <u>See</u> <u>Bennett v. Mueller</u>, 322 F.3d 573, 581-583 (9th Cir. 2003)

27 (finding Dixon to be independent and placing initial burden upon prisoner to challenge

28 adequacy).  Because Petitioner has not met his burden of demonstrating inadequacy or

consistency of the procedural bar, the claim is barred in this proceeding.

b.     Merits

The knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. Napue v. Illinois, 360 U.S. 264 (1959). Petitioner bears the burden of "alleg[ing] facts showing that there was knowing use of the perjured testimony by the prosecution." Pavao v. Cardwell, 583 F.2d 1075, 1076-1077 (9th Cir. 1978). In the context of the presentation of false evidence, Petitioner must prove all of the following: "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." United States v. Zuno-Arce, 339 F.3d 886, 889 (citing Napue, 360 U.S. at 269-271.)

The fact that there may be inconsistencies in certain witnesses statements and other conflicts in the evidence do not establish that the prosecution presented false testimony. See e.g., United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (inconsistencies between testimony at trial and retrial did not amount to presentation of false testimony); see also United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) ("that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollection of events, does not establish that the testimony offered at trial was false").

Petitioner does not support his claim that Rachel Demore and Detective Moses lied when they testified at Petitioner's trial. Although Petitioner claims the prosecutor failed to correct the allegedly false testimony, there is no showing that any of the testimony was indeed false, or that the prosecutor had knowledge of any false testimony. Petitioner's claim is based solely on alleged potential inconsistencies in testimony which does not amount to knowing presentation of false evidence. Indeed, as previously stated *supra*, the jury was well aware of Rachel Demore's plea agreement and was able to judge her credibility. The mere fact that there are contradictions in the testimony does not rise to the level of a due process violation. See Lambert v. Blackwell, 387 F.3d 210, 249, 252 (3rd Cir. 2004) (discrepancies in testimony do not mean testimony is perjured). It is the sole province of the jury to evaluate the evidence presented and determine the truthfulness of the testimony presented. The state court's rejection of this claim was not an

1    objectively unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d).

2            2.    Claim Three

3        Petitioner claims the prosecutor committed misconduct by coercing Perry to testify under

4    an improper plea agreement.

5        Petitioner presented this claim on direct appeal to the California Court of Appeal and

6    California Supreme Court.  Because the California Supreme Court's opinion is summary in

7    nature, however, this Court "looks through" that decision and presumes it adopted the reasoning

8    of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst

9    v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)

10   (establishing, on habeas review, "look through" presumption that higher court agrees with lower

11   court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson,

12   217 F.3d 663, 669 n. 7 (9th Cir. 2000) (holding federal courts look to last reasoned state court

13   opinion in determining whether state court's rejection of petitioner's claims was contrary to or an

14   unreasonable application of federal law under § 2254(d)(1)).

15       The Court of Appeal set forth the background for the claim and issued a reasoned

16   decision stating:

17           When the prosecution called Perry as a rebuttal witness, it began by
         questioning him about the nature of his plea agreement.  The examination
18           included the following:

19           "Q. [by the prosecutor] And in that plea bargain, there were a bunch of
         cases that got taken care of, correct?
20
             "A. [by Perry] Yes.
21
             "Q. In this case you pled guilty to conspiracy to commit robbery and
22       receiving stolen property, correct?

23           "A. Yes.

24           "Q. And in another case, ... you pled guilty to possession of
         methamphetamine and receiving stolen property?
25
             "A. Yes.
26
             "Q. That was a completely unrelated case, right?
27
             "A. Exactly.
28

                                    19

"Q. And in [still another case], you were on probation in that case for possession of a deadly weapon?

"A. Yes.

"Q. So your probation got violated as a result of the plea bargain?

"A. Yes.

"Q. And you got a total stipulated sentence of six years eight months, right?

"A. Yes.

"Q. And as part of that disposition, you agreed to testify truthfully in this case, correct?

"A. Well, the agreement was, was that if Mr. Mejia was to take the stand and say that I was the one that killed Mr. Johannes, then I would have to come in and say basically no to that.  (Emphasis in original.)

"Q. Is that what you understood the agreement to be?

"A. Yes."

[Petitioner] interprets Perry's description of his plea agreement to mean it compelled him to testify he had not killed Johannes, regardless of whether this was in fact the truth.  Perry's testimony pursuant to such an agreement, [Petitioner] reasons, was so prejudicial as to deny him his constitutional right to a fair trial.

"'"[A] defendant is denied a fair trial if the prosecution's case depends on substantially on accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.' [Citation.] Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies defendant a fair trial.  On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid."  (Fn. omitted.)' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 417.)

We understand Perry's statement differently, to mean only that he would not be required to appear as a witness unless Mejia testified and implicated him in Johannes's murder.  That is, we find no support for Mejia's conclusion Perry had been coerced into testifying falsely in that situation.  Indeed, Mejia's argument assumes the thing he was hoping to prove at trial - that Perry killed Johannes - and reasons from that premise that Perry's testimony to the contrary therefore must be false.  "It would be the epitome of naivete," Mejia asserts, "to think that a 23-year-old man facing a life sentence would not testify the way the prosecution wanted him to testify."  This is simply a more dramatic way of saying "'"there is a certain degree of compulsion inherent in any plea agreement."'"  "'(*People v. Maury*, *supra*, 30 Cal.4th at p. 417.)  But this observation is not evidence the

20

prosecution used its bargaining leverage to extract perjured testimony from a witness.

Finally, the prosecution's case against Mejia did not rely to any significant degree; much less did it depend substantially, on Perry's testimony. Perry simply testified he was not the person who robbed and murdered Johannes. The evidence that the person who did was Mejia came from numerous other sources, and was compelling if not overwhelming.

(Lod. Doc. 4 at 18-20.)

There is no showing that the prosecution's agreement with Perry required him to testify falsely. The only valid requirement under the plea agreement was for Perry to testify if Petitioner took the stand and implicated him in the murder. There was no requirement that Perry testify in a false manner. Because Petitioner testified that Perry was the person who committed the murder, it was not improper for Perry to testify at the request of the prosecution that he did not commit the murder. As pointed out by the appellate court, Perry never implicated Petitioner in the murder but only denied that he was the killer. Thus, Petitioner's conviction was not dependent on Perry's testimony, as there was other compelling evidence pointing to Petitioner's guilt. Accordingly, it cannot be said that the state courts' determination of this issue was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

3.    Claim Five

In Claim Five, Petitioner claims the prosecution presented false evidence regarding the boot print that linked him to the murder of Johannes.

a.    Procedural Bar

Petitioner presented this claim to the state Court of Appeal, which found the claim to be procedurally barred because it was neither presented in the direct appeal (Dixon) nor was it presented in the habeas petition to the superior court. The court also found the claim to be without merit.

b.    Merits

Petitioner presented this claim to the California Supreme Court in his first habeas corpus petition filed in that court. The Supreme Court summarily denied the claim.

As support for his claim, Petitioner points to the prosecutor's closing argument, in which

1   he tells the jury, "I submit you will see that's a boot print of the defendant's boot on Bob

2   Johannes' upper deck (referring to a photograph that was in exhibit]." (VII RT 1611.)  Petitioner

3   claims this statement was not supported by the evidence at trial, and the prosecutor made other

4   statements during his argument that were not supported by the evidence.

5        To establish habeas corpus relief on this claim, Petitioner must demonstrate that the

6   prosecutor's remarks so infected the trial that the resulting unfairness deprived him of the right to

7   due process of law.  Hall w. Whitely, 935 F.2d 164, 165 (9th Cir. 1991), citing Donnelly v.

8   DeChristoforo, 416 U.S. 637, 643 (1974).  The California Supreme Court summarily denied this

9   claim.  On habeas corpus review, Petitioner must prove the alleged prosecutorial misconduct had

10  a substantial and injurious effect or influence in determining the jury's verdict.  See Burks v.

11  Borg, 27 F.3d 1424, 1431 (9th Cir. 1994) (Brecht standard applies to claims of prosecutorial

12  misconduct).

13       The state courts' determination of this issue was not contrary to, or an unreasonable

14  application of, clearly established Supreme Court precedent.  In this instance, the jury was

15  specifically instructed that the statements made by the attorneys were not evidence.  (VII RT

16  1558.)  The jurors were also told that they "must decide all question of fact in this case from the

17  evidence received and not from any other source." (VII RT 1559.)  These instructions properly

18  conveyed to the jury that the prosecutor's argument, even assuming arguendo to be inaccurate,

19  should be disregarded if contrary to the evidence presented at trial.  Petitioner's claim to the

20  contrary is without merit.

21            4.    Claim Eighteen

22       Petitioner finally claims the prosecutor committed misconduct by improperly vouching

23  for witnesses.

24            a.    Procedural Bar

25       Petitioner presented this claim in a habeas petition filed in the state superior court.  The

26  court rejected the petition as improperly filed, and found the claim was related to an improper

27  request for discovery-which was not available to Petitioner.  The superior court found since the

28  claim had been rejected on direct appeal, it could not be presented again in a habeas petition.

The claim was presented to the Court of Appeal in a subsequent habeas petition.  The appellate court also found the claim was defaulted, but determined that it had not been presented in the direct appeal and invoked the Dixon bar.  As previously stated, the Dixon bar is both independent and adequate and prevents this Court's review of the claim.  See Bennett v. Mueller, 322 F.3d at 581-583.

> b.    Merits

The California Supreme Court summarily denied the claim, presented as Claim Six of the first petition.  The factual basis for this claim simply re-characterizes the prior misconduct claims by claiming the prosecutor "vouched" for several witnesses.  The basis of Petitioner's claim has been previously addressed and rejected herein.  Accordingly, there is no basis for relief on this claim and it must be denied.

> C.    Ineffective Assistance of Counsel Claims

Petitioner presents three separate claims of ineffective assistance of trial counsel.  These claims appear in the Amended Petition as Claims Eight, Nine, and Ten.

> 1.    Claim Eight

Petitioner appears to contend that counsel was ineffective for failing to show that various witnesses lied, and that Perry's testimony was coerced.  This claim was presented to the California Court of Appeal and California Supreme Court, both of which issued summary denials.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's

1   alleged acts or omissions that were not the result of reasonable professional judgment

2   considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

3   (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

4   indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

5   professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

6   Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

7       Second, the petitioner must show that counsel's errors were so egregious as to deprive

8   defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

9   also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

10  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

11  1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

12  was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

13  (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

14  have been different.

15      A court need not determine whether counsel's performance was deficient before

16  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

17  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

18  prejudice, any deficiency that does not result in prejudice must necessarily fail.

19      Ineffective assistance of counsel claims are analyzed under the "unreasonable

20  application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

21  1058, 1062 (2000).

22      For the reasons explained above in section A, there is no merit to Petitioner's Brady and

23  prosecutorial misconduct claims, and there is no evidence of coerced testimony or fabricated

24  evidence.  There is likewise no basis to find counsel was ineffective or that Petitioner was

25  prejudiced.  Thus, the state court's rejection of this claim was neither unreasonable nor contrary

26  to the holding in Strickland.

27          2.      Claim Nine

28  Petitioner contends counsel was ineffective for failing to present impeachment evidence

concerning Perry.  This claim was presented to the Court of Appeal in a habeas corpus petition.

The claim was also presented as part of Claim Twelve of his first petition filed in the California

Supreme Court.  Both courts denied the claims.

a.  <u>Procedural Bar</u>

The Court of Appeal found the claim to be procedurally barred, as it construed the claim

that Petitioner presented as Ground Five in the habeas petition filed in that court.  The court then

found Petitioner had failed to present the claim in his petition to the superior court.  Thus, as with

the some of the other claims, this claim is barred by <u>Dixon</u>.

b.  <u>Merits</u>

Petitioner's claim that counsel failed to present impeachment evidence regarding witness

Perry, is without merit.  As the Court of Appeal noted, the jury was well aware of the deal Perry

made with the district attorney in exchange for his testimony.  Thus, there is no basis to find

counsel was ineffective.  Moreover, the state court reasonably found that no prejudice arose from

Perry's testimony because the prosecution's case did not rely significantly on Perry's testimony,

and the evidence of Petitioner's guilt "was compelling if not overwhelming."  Petitioner has not

demonstrated the state court's adjudication of the claim resulted was an unreasonable application

of clearly established federal law, and his claim must be denied.

3.  <u>Claim Sixteen</u>

Petitioner finally contends counsel was ineffective for failing to object to the jury's

instruction according to CALJIC No. 17.01.   Petitioner presented this claim to the California

Supreme Court, which rejected it citing <u>In re Robbins</u>, 18 Cal.4th 770, 780 (1998) and <u>In re

Clark</u>, 5 Cal.4th 750 (1993).

a.  <u>Procedural Bar</u>

The California Supreme Court rejected this claim, citing <u>In re Robbins</u>, 18 Cal.4th 770,

780 (1998) and <u>In re Clark</u>, 5 Cal.4th 750 (1993).

b.  <u>Merits</u>

The parties and the court conferred as to whether the court should give a "unanimity"

instruction, and ultimately agreed it should be given.  The jury was instructed as follows:

1

2

3

4

5

> The defendant is accused of having committed the crime of murder in Count 1.  Prosecution has introduced evidence for the purpose of showing that there is more than one act or omission upon which a conviction on Count 1 may be based.  The defendant may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of the acts or omissions.  However, in order to return a verdict of guilty to Count 1, all jurors must agree that he committed the same act or omission.  It is not necessary that the particular act or omission agreed upon be stated in your verdict.

6

(RT 1585.)

7

8

9

10

11

As an initial matter, the state court's determination to give a particular jury instruction is made based on its application and interpretation of state law.  Habeas corpus relief is available to correct violations of federal law only.  28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 68 (1991).  In order for relief, Petitioner must demonstrate that the trial court's instructions to the jury rendered his trial fundamentally unfair.  Id. at 71-72.

12

13

14

15

16

17

18

19

Petitioner has failed to meet his burden.  Due Process does not require an instruction that the jury unanimously agree about which piece of evidence supports which charge.  Consequently, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line . . . there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."  McKoy v. North Carolina, 494 U.S. 433, 449 (1990) (Blackman, J, concurring).  Therefore, because the instruction did not lead to an unconstitutional deprivation of due process, Petitioner has not demonstrated that counsel was ineffective or that he was prejudiced under Strickland.

20

D.       Instructional Error Claims

21

22

Petitioner presents three separate claims of instructional error, set forth in Claims Twelve, Thirteen, and Fifteen of the Amended Petition.

23

1.       Claim Twelve

24

25

26

27

Petitioner contends the trial court erred when it failed to instruct the jury that Perry was an accomplice, and his trial counsel was ineffective for failing to object.  This claim was presented on direct appeal to the state appellate court and was denied in a reasoned decision.  Petitioner then filed a petition for review in the California Supreme Court which was denied.

28

The Court of Appeal denied the claim as follows:

26

Mejia faults the trial court for "convinc[ing] an unprepared defense attorney," and the attorney for allowing himself to be convinced, to withdraw his request for accomplice instructions in regard to the testimony of Josh Perry. (Mejia does not appear to be making the same arguments with respect to Rachel Demore's far more damaging testimony.)

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.)

The defense, at the outset of the trial, asked the court to instruct the jury that Perry was an accomplice as a matter of law (CALJIC No. 3.16), that an accomplice's testimony should be viewed with caution (CALJIC NO. 3.18), and that accomplice testimony must be corroborated by other evidence (CALJIC No. 3.11).[fn.3]

[fn.3] The defense also requested CALJIC No. 3.10 (accomplice defined); CALJIC No. 3.12 (sufficiency of corroborative evidence); CALJIC No. 3.13 (one accomplice cannot corroborate another); CALJIC No. 3.14 (criminal intent necessary to make one an accomplice); CALJIC No. 3.19 (defendant's burden to prove witness was an accomplice).

The prosecution's general theory of the case, as broadly outlined to the jury in closing argument, was that Mejia and Perry had agreed to meet at Johanne's house on March 2, 2005, to get him high on methamphetamine, and then to steal the large amount of money they believed he kept in his bedroom.  But Perry decided at the last minute, apparently because he had been paid a visit the same day by his probation officer, that he would not participate in the plan. Consequently, he never showed up at Johannes's house.

The prosecution decided to call Perry as a witness, and only then as a rebuttal witness, after Mejia decided to testify and identify Perry as the person who beat Johannes to death.  Perry's testimony was limited to his denial he had taken any direct part in either the theft or the beating; he did not give any testimony implicating Mejia in these crimes. [fn. 4]

[fn. 4] Perry acknowledged he had agreed to plead guilty to conspiracy to commit robbery and receiving stolen property because he was in fact guilty to those offenses.  He did not say he had conspired with Mejia or received the stolen property from him, although that might reasonably have been inferred under the circumstances.

The question then in regard to the accomplice instructions was whether to tell the jury, in effect, that Perry had conspired with Mejia to commit murder. Mejia's defense at that point was that he had not conspired with Perry to do anything; that he had gone to Johannes's house that day with purely innocent intentions; that Perry's sudden appearance at the house was completely unexpected; and that he (Mejia) had done nothing to assist or encourage Perry's assault on Jonnanes.  The court asked defense counsel whether, with the case in this posture, he still wanted the court to give the accomplice instructions.  The

following exchange is representative.

"THE COURT: ... I don't want to make a mistake here and I certainly want to give your client every benefit that he's entitled to in the instructions but if I give that [i.e., an accomplice is a person subject to prosecution for the identical offense], aren't I announcing to the jury that [Perry is] an accomplice to murder with your client?

"MR. CHANNELL [defense counsel]: No ..., because at one point, Rachel Demore, Perry and Mejia were all charged with murder.

"THE COURT: Well, you can clearly argue that[,] but now you've go to get from there to being an accomplice to the specific count [Mejia] is charged with. [¶] ... [¶]

"... That's the hard part because what I'm telling [the jurors] to do, if they find from the facts that ... either Demore or Perry are accomplices, they're accomplices with your client by reason of aiding and abetting him in a criminal conspiracy to commit murder.  You can clearly argue with or without this instruction that they were offered plea bargains, they were charged with the same offense and you think they did it, but you really want me to instruct the jury that they should consider whether Josh Perry is accomplice with your client for murder?

"MR. CHANNELL: The way you're phrasing it, absolutely not.

"THE COURT: Well, that's what it says. [¶] ... [¶] Now, maybe I'm missing something, and I'd like to get the perspective from the district attorney. . .

"MR. SEGERSTROM [the prosecutor]: ... [I]t is the People's view that Demore was not an accomplice and that's why I objected to these [instructions]. Perry was clearly an accomplice to the robbery.

"THE COURT: Which [Mejia] isn't charged with.

"MR. SEGERSTROM: Correct. . . . [T]he plea bargain [with Perry] was struck [] because he didn't show up for the robbery and didn't commit the homicide.  Now ... [¶] ... [¶][t]here's evidence from the defense that he did. ... [A]ssuming, as I anticipate[,] that Perry testifies, ... the purpose of these instructions really is to require corroboration ...[¶] ... [¶] [of Perry's testimony] to convict [Mejia].  To the extent that a murder conviction is based on felony murder on a robbery theory, I think the answer is yes, [Perry] is an accomplice to the crime of robbery. [¶] ... [¶]

"MR. CHANNELL: ... You know, I guess either way is that if it's given, and it's incorrect, we're going to get dinged by the appellate court and if I don't give it and it's incorrect [sic, correct], then it's going to come back incompetence of counsel. [¶] ... [¶] So, I'm just trying to think which one is the better way to go. [¶] ... [¶]

"THE COURT: I think I'm inclined to give it.  I think I'm inclined to give it.

"MR. CHANNELL: I'm going to withdraw it, I think - well, okay.  While you're talking, I'm sitting here and [I'm] trying to balance out how to do this.  I

don't want the Court instructing the jurors that Mr. Mejia is - for this instruction to be given, basically I know you're not going to say it that way, but for this instruction to be given, that Mr. Mejia had to have been involved with the murder[,], and my argument to the jury is he is not, that Josh Perry did it, so I think based upon the wisdom of the Court and its understanding, that I'm going to withdraw it."

Defense counsel had several subsequent opportunities to reconsider and renew his request for accomplice instructions, including after Perry testified, but he did not.

To say the trial court "convicted an unprepared defense attorney" to withdraw his request for accomplice instructions completely mischaracterizes what actually happened her, and unfairly denigrates both the court and the attorney. The court and both counsel engaged in a lengthy and thoughtful discussion of the instructions; defense counsel was given ample time and opportunity to weigh the relative advantages and disadvantages of giving them; and by all appearances he took good advantage of the opportunity. More to the point here, there clearly were advantages and disadvantages to giving the instructions. Mere disagreement with the reasonable tactical choices made by an attorney in the course of providing a defense is no basis for finding ineffective assistance of counsel. (*People v. Frierson* (1979) 25 Cal.3d 142, 158 [except in rare cases, appellate court should not try to second-guess trial counsel's choice of tactics].)

"An accomplice is a person who is subject to prosecution for the identical offense charged ... against the defendant on trial by reason of aiding and abetting [the defendant to commit the offense]." (CALJIC No. 3.10.) The "identical offense" in this instance was murder.

Mejia observes that Perry might have been subject to prosecution for murder even had he not conspired to commit that specific crime. That is, a person who conspires with another to commit an offense may be held liable for a different offense committed in the course of the conspiracy, if the other offense was a natural and probable consequence of the intended one. *(People v. Garcia* (2000) 84 Cal.App.4th 316, 325,326.) Thus, Perry might theoretically have been an accomplice in Johannes's murder if he conspired with Mejia to rob Johannes, and Johannes was killed during the robbery (and if Perry was still a member of the conspiracy when the robbery occurred). This same reasoning, of course, would also have made Mejia liable for the murder, which presumably is why he took the position he had not conspired with Perry at all, to do anything.

There were, in short, sound tactical reasons for not wanting to identify Perry as Mejia's accomplice. (See *People v. Hill* (1967) 66 Cal.2d 536, 555-556 [if a witness has admitted the crime charged against the defendant, an instruction identifying the witness as the defendant's accomplice tends to impute the witness's admission to the defendant].) It is not error in this situation to omit the instruction. (*Id.* at p.555.)

(Lod. Doc. 4 at 12-16.)

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. at 71-72. To

1   obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

2   instruction by itself so infected the entire trial that the resulting conviction violates due process.

3   Estelle, at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be

4   considered in the context of the instructions as a whole and the trial record. Id.  The court must

5   evaluate jury instructions in the context of the overall charge to the jury as a component of the

6   entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v.

7   Kibbe,  431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined that the instruction

8   violated the petitioner's right to due process, a petitioner can only obtain relief if the

9   unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

10  actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993)

11  (whether the error had a substantial and injurious effect or influence in determining the jury's

12  verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

13  demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

14  attack on the constitutional validity of a state court's judgment is even greater than the showing

15  required to establish plain error on direct appeal." Id.

16          The state courts' determination of this issue was not contrary to, or an unreasonable

17  application of, clearly established Supreme Court precedent.  The trial court reasonably

18  determined the instruction was not necessary because the jury might infer Petitioner's guilt from

19  the instruction that Perry was an accomplice.  Counsel's decision to request to withdrawn the

20  instruction was reasonably given the negative inference.  Thus, counsel was not ineffective and

21  the state appellate court's decision was not unreasonable.  28 U.S.C. § 2254(d).

22                    2.    Claim Thirteen

23          Petitioner contends the court erroneously failed to instruct the jury on factors affecting the

24  credibility of witnesses, and defense counsel was ineffective for failing to object.  Petitioner

25  presented this claim on direct appeal, and the state appellate court issued a reasoned decision

26  denying the petition.  Petitioner presented the claim to the California Supreme Court, which

27  issued a summary denial.

28          The Court of Appeal issued a thorough and reasoned decision finding the claim to be

without merit:

> Defense counsel asked the court to instruct the jury pursuant to CALJIC No. 2.20 that one of the factors it could consider in assessing the believability of a witness (Perry and Demore specifically) was whether he or she was testifying under a grant of immunity. (See *People v. Echevarria* (1992) 11 Cal.App.4th, 449, 449-450.) Counsel abandoned the request once it was pointed out that neither Perry nor Demore had in fact been granted immunity.

> "MR. SEGERSTROM [the prosecutor]: There hasn't been an outright grant of immunity. There has been a plea bargain.

> "THE COURT: Which I think goes to the credibility of the witness, but it's not an outright grant of immunity and I don't think there is one.

> "MR. SEGERSTROM: No, I mean, if she got up on the witness stand and said yeah, yeah, yeah, I did it, I could still charge her.

> "MR. CHANNELL: Well, okay, I have to go back to my law school stuff here which I haven't thought about in years. Transactional immunity.

> "THE COURT: Well, transactional immunity, it's still a grant of immunity and there isn't a technical, as defined in the Penal Code, grant of immunity here. There's plea bargains and you can argue that at length...."

Mejia concedes there was no immunity, but faults the court for "formalistically following" the wording of CALJIC NO. 2.20 rather than modifying the instruction, sua sponte, "to refer to the plea agreement that prosecution witnesses entered into with the district attorney before they testified against [Mejia]." He also maintains his trial counsel was ineffective for failing to press the point.

Moreover, the unmodified CALJIC No. 2.20 instruction adequately conveys the rather obvious point that a witness's testimony may be colored by his or her self-interest. It advises the jury it is "the sole judge [] of the believability of a witness[,]" and that it may consider "anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness." This is followed by a nonexclusive list of general factors that may, depending on the circumstances, reflect on a witness's truthfulness. The list includes "[t]he existence or nonexistence of a bias, interest, or other motive." Adding to this list that the jury may consider whether the witness was testifying pursuant to a plea agreement only would have provided a more specific example of this same general idea. (See *People v. Castro* (1979) 99 Cal.App.3d 191, 196–197 [not error in light of CALJIC No. 2.20 to refuse cautionary instruction regarding testimony of a witness "'who provides evidence against the defendant for pay or for immunity from punishment, or for personal advantage or vindication'"].)

Defense counsel went to considerable lengths in his cross-examination of Demore and Perry, and in his closing argument, to call the jury's attention to their agreements with the prosecution to testify in this case. The jury cannot have missed the suggestion, indeed the accusation, that their testimony was self-serving and untruthful. We do not mean to say necessarily that the trial court would have been justified in refusing a properly worded addition to CALJIC No. 2.20, but only that defense counsel's failure to offer one, if error, was undoubtedly

1    harmless.  (*People v. Garcia*, *supra*, 99 Cal.App.3d at pp. 197-198.)

2

3    In this instance, the state appellate court properly found no error because the trial court

4    was not required to modify the instruction as Petitioner requested.  Furthermore, counsel's failure

5    to offer a modified version of the instruction could not have prejudiced Petitioner because the

6    jury was well aware of Demore's and Perry's motives to give self-serving testimony, in light of

7    their possible involvement in the events leading to Johannes's murder.  Therefore, there is no

8    basis to question the appellate court's decision.

9                    3.    Claim Fifteen

10    Petitioner contends the trial court erred by instructing the jury with CALJIC No. 17.01.

11    Petitioner presented this claim in the second petition filed in the California Supreme Court.

12                    a.    Procedural Bar

13    The California Supreme Court denied the claim, citing to In re Robbins, 18 Cal.4th at 780

14    and In re Clark, 5 Cal.4th 750.

15                    b.    Merits

16    As with the related ineffective assistance of counsel claim, Petitioner has not shown the

17    instruction, even if assumed given in error, rendered his trial fundamentally unfair.  Estelle, 502

18    U.S. at 71-72.  There is no constitutional guarantee that the jury unanimously agree about which

19    piece of evidence supports which charge.  As previously mentioned, "different jurors may be

20    persuaded by different pieces of evidence, even when they agree upon the bottom line . . . there is

21    no general requirement that the jury reach agreement on the preliminary factual issues which

22    underlie the verdict."  McKoy v. North Carolina, 494 U.S. at 449 (Blackman, J, concurring).

23    Accordingly, there is no merit to this claim.

24            E.    Insufficient Evidence-Claim Seventeen

25    Petitioner contends his conviction is not supported by sufficient evidence.  Petitioner

26    presented this claim in his second habeas petition to the California Supreme Court.  The petition

27    was summarily denied.

28                    1.    Procedural Bar

1    The California Supreme Court denied the claim, citing <u>In re Robbins</u>, 18 Cal.4th at 780

2    and <u>In re Clark</u>, 5 Cal.4th 750.

3          2.    <u>Merits</u>

4    Notwithstanding the procedural bar, Petitioner's claim fails on the merits.  The law on

5    insufficiency of the evidence claim is clearly established.  The United States Supreme Court has

6    held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must

7    determine whether, viewing the evidence and the inferences to be drawn from it in the light most

8    favorable to the prosecution, any rational trier of fact could find the essential elements of the

9    crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  Sufficiency

10   claims are judged by the elements defined by state law.  <u>Id</u>. at 324, n. 16.

11   There was more than sufficient evidence to support Petitioner's conviction of murder.

12   Petitioner's prints were found on Johannes's cane, which had human blood on it and appeared to

13   be bent.  (III RT 659, IV RT 994-998.)  After leaving Johannes's residence, Petitioner arrived at a

14   friends' home with a pillowcase full of items belonging to Johannes, including a gun Petitioner

15   had previously sold to him.  (III RT 541-543, IV RT 848-849.)  Demore testified that Petitioner

16   admitted he hit Johannes with the cane.  (IV RT 845-845.)  Petitioner also told friends that he

17   intended to beat up and rob Johannes.  (III RT 536-538, IV RT 788.)  In light of this evidence,

18   the state court's rejection of this claim was not contrary to, nor an unreasonable determination of

19   clearly established federal law.  Nor was it based on an unreasonable determination of the facts in

20   light of the evidence.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to relief.

21         F.    <u>Claim Fourteen</u>

22   Petitioner claims that "CDCR Administration hindered access to the courts."  Petitioner

23   presented this claim in his first state petition filed in the California Supreme Court.  The petition

24   was denied.

25   This claim is not cognizable under section 2254 because it does not challenge the legality

26   of Petitioner's custody.  Nor has Petitioner suffered any harm resulting from the alleged

27   hindrance by prison officials, as the claims are being reviewed on the merits.

28   ///

///

## ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and

3.      The Court declines to issue a certificate of appealability.  28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," i.e., when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong"; Hoffman v. Arave, 455 F.3d 926, 943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable jurists would not find it debatable that the state courts' decision denying Petitioner's petition for writ of habeas corpus were not "objectively unreasonable."

IT IS SO ORDERED.

Dated:   __April 8, 2011__                    _____/s/ Sandra M. Snyder_____
                                              UNITED STATES MAGISTRATE JUDGE